IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| In re: | ) Chapter 11 |
| --- | --- |
| BUFFETS HOLDINGS, INC., et al., | ) Bk. No. 08-10141 (MFW) |
| | ) Adv. No. 09-50894 (MFW) |
| | ) |
| Debtors. | ) Jointly Administered |

| BUFFETS, INC., et al., | ) |
| --- | --- |
| | ) |
| Appellants, | ) |
| | ) |
| v. | ) Civ. No. 11-859-SLR |
| | ) |
| CALIFORNIA FRANCHISE TAX | ) |
| BOARD, | ) |
| | ) |
| Appellee. | ) |

**MEMORANDUM ORDER**

At Wilmington this 31st day of October, 2012, having reviewed the papers submitted in connection with the above captioned appeal;

IT IS ORDERED that the above captioned appeal is dismissed for the reasons that follow:

**1. Standard of Review.** This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 80 (3d Cir. 1999). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of

the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101-02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. *In re Hechinger*, 298 F.3d 219, 224 (3d Cir. 2002); *In re Telegroup*, 281 F.3d 133, 136 (3d Cir. 2002).

2. **Background.** Appellants (also "Buffets"), operators of the largest chain of United States based buffet style restaurants,[1] filed Chapter 11 bankruptcy petitions in the District of Delaware on January 22, 2008. (D.I. 3 at ex. 16, pg 2-3) On July 10, 2008, the California Franchise Tax Board ("FTB")[2] filed proofs of claim against appellants alleging that they underpaid the taxes they owed to California in years 1997, 1998, 1999, 2000, 2002, 2005 and 2006. A summary judgment motion was subsequently filed and decided by the bankruptcy court. Appellants contest that judgment. (D.I. 1 & 9)

3. Under California's Uniform Division of Income for Tax Purposes Act ("UDITPA"), unitary businesses[3] such as Buffets are ordinarily taxed according to the

---

[1] Buffets' restaurant chains include HomeTown Buffet, Old Country Buffet, Roadhouse Grille and Tahoe Joe's. (D.I. 3 at ex. 16, pg 2)

[2] The FTB is the state agency empowered to assess and collect corporate franchise taxes. (D.I. 3 at ex. 2, pg. 7)

[3] "A unitary business is generally defined as two or more business entities that are commonly owned and integrated in a way that transfers value among the affiliated

2

following formula (aimed at apportioning in-state versus out-of-state income): unitary income x [(sales factor x 2) + property factor + payroll factor)/4]. CAL. REV. & TAX. CODE § 25120 et. seq. Thus, the portion of a unitary businesses' income attributable to economic activity in a given state

> is determined by combining three factors: payroll, property, and sales. Each factor is a fraction in which the numerator measures activity or assets within a given state, while the denominator includes all activities or assets anywhere. The combination of these fractions is used to determine the fraction of total global business income attributable to the given state.[4] This method provides a rough but constitutionally sufficient approximation of the income attributable to business activity in each state.

*Microsoft Corp.,* 139 P.3d at 1172.

4. With specific respect to the sales factor, sales (i.e., gross receipts) include the entire amount received upon redemption of a marketable security (i.e., the return of principal along with any income made off the sale) as opposed to the net difference between the amount received and the original purchase price. *Id.* at 1173-78. In the instant case, appellants had an Egan, Minnesota-based treasury department making short term investments that "earned maximum returns while still [allowing cash to be] readily available for use in the restaurant business." (D.I. 3 at ex. 16, pg. 5) This is significant because "increases in out-of-state gross receipts[5] will lead to a reduction in . . . California tax." *Id.* at 1172. In short, the redemption of marketable securities by a

---

entities." *Microsoft Corp. v. Franchise Tax Bd.*, 139 P.3d 1169, 1172 (Cal. 2006) (citation omitted).

[4] With the sales factor being multiplied by 2, it is given the most weight of the three factors.

[5] Here, Minnesota-based gross receipts as opposed to those in California.

3

decent-sized treasury department - here, Buffets' Egan, MN-based department - will have the effect of greatly increasing the sales factor denominator without a corresponding increase in the numerator, thereby diluting the percentage of sales attributable to California (and all other states aside from Minnesota). *Id.* at 1173.

5. Because California recognizes that "the allocation and apportionment provisions of [its] act" will sometimes "not fairly represent the extent of the taxpayer's business activity in this state," the FTB is permitted, when reasonable, to require:

(a) Separate accounting;
(b) The exclusion of any one or more of the factors;
(c) The inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or
(d) The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

CAL. REV. & TAX. CODE § 25137.

6. Given the allegedly distorting effects of the appellants' treasury activities and the powers vested in it by the above provision, the FTB employed a different method of apportionment and argued that that method more equitably accounted for the amount of activity occurring in California. (D.I. 3 at ex. 16, pg. 7) Specifically, the FTB recommended utilizing a formula that only included "the interest income or gain from Treasury Investments and not the return of principal amount of the Treasury Gross Receipts." (*Id.*) The bankruptcy court agreed with the FTB and granted summary judgment in its favor.[6] (D.I. 3 at ex. 16 & 17)

7. **The *Microsoft* decision.** Both parties extensively cite to and acknowledge

---

[6] While it also denied summary judgment to the FTB on another point, that issue is not relevant to this appeal and, therefore, addressed no further.

the applicability and significance of the California Supreme Court's decision in *Microsoft Corp. v. Franchise Tax Board*, 139 P.3d 1169 (Cal. 2006). Like Buffets, Microsoft is a unitary business with operations in California but a headquarters and treasury department located elsewhere (namely, Washington State). *Id.* at 1172. The first question addressed by the *Microsoft* Court was whether the entire amount received upon redemption of a marketable security (as opposed to the net difference between the amount received and the original purchase price) should be included in Microsoft's gross receipts and, thus, sales factor. *Id.* at 1173-78. As explained above, the Court found that it should. The Court then went on to address the effect that this decision had on the use of CAL. REV. & TAX. CODE § 25137; as the Court explained: "Our conclusion that the full redemption price constitutes gross receipts does not end matters. The UDITPA includes a relief provision for dealing with any unreasonable calculations rote application of the [above] formula may yield." *Id.* at 1178. In *Microsoft*, the FTB argued that the "inclusion of the full [redemption] price does not fairly represent the extent of Microsoft's business activity in California" and, therefore, an alternative and more equitable distribution was appropriate. *Id.* The Court went on to note that "[a]s the party invoking section 25137, the [FTB] has the burden of proving by clear and convincing evidence that (1) the approximation provided by the standard formula is not a fair representation, and (2) its proposed alternative is reasonable." *Id.*

8. Having framed the second issue as when and how the UDITPA relief provision can be appropriately utilized when gross receipts include the full redemption price of a security, the *Microsoft* Court made the following observations:

5

> [T]he problem arising from inclusion of the full sale or redemption price of a short-term security is not that the full price is not gross receipts. Rather, the problem is one of scale: short-term securities investments involve margins (i.e., differences between cost and sale price) that may be several orders of magnitude different than those for other commodities. When a short-term marketable security is sold or redeemed, the margin will often be, in absolute terms, quite small (though of course the **annualized** returns may well be perfectly respectable). Microsoft's treasury activities provide a perfect illustration. Its 1991 redemptions totaled $5.7 billion, while its income from those investments totaled only $10.7 million—a less than 0.2 percent margin. In contrast, its nontreasury activities produced income of $659 million and gross receipts of $2.1 billion, for a margin of more than 31 percent, roughly 170 times greater.
>
> This situation, when one mixes apples—the receipts of low-margin sales—with oranges—those of much higher margin sales—presents a problem for the UDITPA. The UDITPA's sales factor contains an implicit assumption that a corporation's margins will not vary inordinately from state to state.

*Id.* at 1180 (emphasis in original). The Court went on to say that the formula

> works well enough in the absence of huge variations in state-to-state margins. It also provides a necessary antidote to strictly geographic accounting that may overlook the interdependence of operations across state lines or be susceptible to manipulation. However, modern corporate treasury departments whose operations are qualitatively[7] different from the rest of a corporation's business and whose typical margins may be quantitatively several orders of magnitude different from the rest of a corporation's business pose a problem. Under the UDITPA, the operations and gross receipts of a treasury department are properly attributed to the state where the department operates—here, Washington. (See § 25136.) The nature of these operations means that Microsoft's true margin for its Washington operations will be much, much lower than the worldwide average, and its margin for every other state will be much higher than the worldwide average. Thus, rotely applying the worldwide average margin (Total Income/Total Sales) to each state's gross receipts would result in severely underestimating the amount of income attributable to every state **except** the state hosting the treasury department, for which state the income would be correspondingly severely overestimated. In such circumstances, rote application of the standard formula does not fairly represent the extent of a taxpayer's activity in each state[.]"

---

[7] There is no dispute on appeal that Buffets' restaurant operations are qualitatively different from the type of business undertaken by its treasury department.

*Id.* (emphasis in original) The Court, therefore, concluded that the

> stipulated evidence establishes that mixing the gross receipts from Microsoft's short-term investments with the gross receipts from its other business activity seriously distorts the standard formula's attribution of income to each state. These transactions generated minimal income (just under 2 percent of Microsoft's business income for 1991) but enormous receipts (approximately 73 percent of gross receipts for 1991). Their inclusion in the standard formula would result in reducing roughly by half the estimated income attributed to California, and likely every state other than Washington, depending on property and payroll factors. The distortion the Board has shown here is of both a type and size properly addressed through invocation of section 25137; application of the standard formula does not fairly represent the extent of Microsoft's business in California.

*Id.* at 1182. The above decision left only one remaining issue for the Court: was the FTB's proffered alternative, using only net receipts from redemptions in the denominator of the formula, a reasonable one? *Id.* The Court concluded that it was. *Id.*

9. **Analysis.** Buffets argues on appeal that the FTB failed to prove by clear and convincing evidence that application of CAL. REV. & TAX. CODE § 25137 was 1) warranted or 2) reasonable in its application. (D.I. 9 at 1-2) With respect to the initial applicability of § 25137, Buffets focuses on language in the *Microsoft* decision discussing profit margins "several orders of magnitude different" and "huge variations in state-to-state margins." According to Buffets, *Microsoft* teaches that sufficient quantitative distortion exists when: 1) "a taxpayer's non-treasury profit margin is 'several orders of magnitude' i.e., 100 to 1,000 times greater than treasury profit margins" and 2) these profit margin differences "produce 'huge variations in state-to-state margins.'"[8] (D.I. 9 at 11-12 (quoting *Microsoft*)) With these principles in mind,

---

[8] Relatedly, Buffets argues that, because the FTB has the burden, it was required to prove by clear and convincing evidence Buffets' Minnesota profit margin.

7

Buffets argues that the profit and state-to-state margins at bar are not sizable enough to produce the type of distortion that warrants the use of § 25137. (*Id.* at 10-15) In particular, Buffets notes that its treasury profit margin for the years at issue was .08% and it's non-treasury profit margin was 4.25%, "about 50 times greater," relative to the 170 times in *Microsoft*. (*Id.* at 13) Moreover, Buffets emphasizes that the state-to-state margin was only .08% (MN)[9] to 4.25% (other states), not a "huge" variation. (*Id.* at 14-15)

    10. The court, like the bankruptcy court, disagrees with appellants. While appellants would like the court to find that "several orders of magnitude" requires at least a 100 times difference between the treasury and non-treasury profit margins, *Microsoft* does not mandate this. As the bankruptcy court noted, other California courts have applied § 25137 with profit margin differences of 74, 42 and 34 times. (D.I. 3 at ex. 16, pg. 13). Moreover, the *Microsoft* Court did not require a finding of "huge variations" in state-to-state margins, but focused instead on the difference between treasury and non-treasury profit margins. In this regard, the Court explained that Microsoft's Washington State profit margin (where its treasury department was located) "will be much, much lower than the [nation]wide average, and its margin in every other state will be much, much higher than the [nation]wide average" given that non-treasury profit margins were 170 times greater than treasury margins. *Microsoft Corp.*, 139 P.3d at 1181. Thus, appellants are incorrect when they argue that a precise state-to-state

---

(D.I. 9 at 14)

[9] Buffets assumes, for purposes of the argument, that Minnesota's profit margin was equivalent to the treasury margin.

profit margin comparison is required under *Microsoft*. Indeed, as the FTB explains, such analysis would be impossible to determine since the whole purpose of the UDITPA is to determine "rough but constitutionally sufficient approximation of the income attributable to business activity in each state." (*See* D.I. 10 at 18 (describing the circular nature of appellants' argument)) In the instant case, *Microsoft* simply requires clear and convincing evidence that income attributable to California will not be fairly approximated via rote application of the formula. *Microsoft Corp.*, 139 P.3d at 1181. The court finds that such proof has been established.

12. To the extent that appellants object to the bankruptcy court's other conclusions on quantitative distortion,[10] the court finds the bankruptcy court's analysis to be in line with *Microsoft*. Specifically, the bankruptcy court's discussion of and reliance on quantitative income differences was appropriate given that *Microsoft* touched on the same distortions.[11]

13. With respect to appellants' contention that the FTB's alternative formula for apportionment - only including net receipts from treasury income in the denominator of the sales factor - is not reasonable, the court disagrees. As the bankruptcy court

---

[10] The appellants' main contentions are addressed above, but they also appear to more generically object to the bankruptcy court's application of *Microsoft*. (See D.I. 9 15-18)

[11] Just as the *Microsoft* Court noted that Microsoft's short term treasury investments accounted for 73% of the company's gross receipts but only 2% of its income, *Microsoft Corp.*, 139 P.3d at 1178-79, the bankruptcy court noted that appellants' treasury activities generated 77% of gross receipts but only 5.4% of income (D.I. 3 at ex. 16, pg 14); and just as the *Microsoft* Court discussed the 24% of overall income being attributed to Washington, *Microsoft Corp.*, 139 P.3d at 1178-79, the bankruptcy court noted that 38.5% of overall income would be attributed to Minnesota (D.I. 3 at ex. 16, pg 14).

9

explained, the Supreme Court of California in *Microsoft*

> approved an identical proposal. The Court in *Microsoft* found that including only net receipts from treasury activities in the sales factor was reasonable because those receipts "were so small in comparison to Microsoft's non-treasury income and receipts." The same is true here. In *Microsoft*, the net receipts from treasury activities was $10.7 million, while its non-treasury activities produced income of $659 million and gross receipts of $2.1 billion. Here, for the [years at issue, appellants'] net receipts from treasury activities was $15.1 million, while its non-treasury activities produced income of $233 million and gross receipts of $5.5 billion. Like in *Microsoft*, [appellants'] net receipts from treasury activities are quite small in comparison to its non-treasury income and gross receipts. Accordingly, the Court concludes that the FTB's proposal . . . is reasonable.

(D.I. 3 at ex. 16, pg 16 (quoting *Microsoft*) (citations omitted))

14. **Conclusion.** For the reasons explained, the bankruptcy court's decision is affirmed, and the appeal therefrom is dismissed.

_____
United States District Judge